UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------
ALLEN BROWN,

                Plaintiff,

                                          15 CV 4488 (KAM)(RER)

        -against-

THE CITY OF NEW YORK,
Police Officer JEFFREY SMITH, Shield No. 5466,
Sergeant JERRY GARCIA, Shield No. 2320, Police
Officer ANTHONY BIONDOLILLO, Shield No. 4033, and
Police Officer JAY RICHIEZ, Shield No. 4293,

                Defendants.
-------------------------------------------------------------------

---

**MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' RULE 72 OBJECTIONS TO
MAGISTRATE JUDGE REYES'S MEMORANDUM
AND ORDER GRANTING PLAINTIFF SANCTIONS**

---

LAW OFFICES OF JOEL B. RUDIN, P.C.
Joel B. Rudin
Haran Tae
152 West 57th Street, 8th Floor
New York, New York 10019
(212) 752-7600
jbrudin@rudinlaw.com
htae@rudinlaw.com

Amy Rameau, Esq.
16 Court Street, Suite 2504
Brooklyn, New York 11241
(718) 887-5536
rameaulawny@gmail.com

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

TABLE OF AUTHORITES ................................................................................................ iii

PRELIMINARY STATEMENT ....................................................................................... 1

RELEVANT FACTUAL BACKGROUND ...................................................................... 3

      A.    The Incident and the Early Investigation ............................................. 3

      B.    Pleadings, Initial Disclosures, and Initial Discovery Requests............................ 4

      C.    Defendants' Stonewalling During Discovery ......................................... 5

      D.    Depositions ............................................................................ 8

      E.    Defendants Finally Produce the Recording ........................................ 9

      F.    The Significance of the Recording .................................................. 10

      G.    Magistrate Judge Reyes Grants Plaintiff's Motion for Sanctions........................ 12

ARGUMENT ................................................................................................................. 15

      A.    Standard of Review.................................................................... 15

      B.    Contrary to Defendants' Misstatement of the Law, Imposing Sanctions
          Pursuant to the Court's Inherent Power Does Not Always Require a Finding of
          Bad Faith ............................................................................. 16

      C.    In Any Case, Defendants Did Act in Bad Faith .................................... 18

      D.    Alternatively, Because Rule 26(a) and (e) Required Disclosure of the
          Recording, Rule 37(c)(1) Authorized Sanctions, Without a Finding of Bad
          Faith .................................................................................. 22

      E.    The Particular Sanctions Judge Reyes Imposed Were Properly Within the
          Court's Discretion..................................................................... 25

CONCLUSION............................................................................................................... 28

# TABLE OF AUTHORITES

## Cases

*Agence France Presse v. Morel*, 293 F.R.D. 682 (S.D.N.Y. 2013) ................................................ 25

*Agiwal v. Mid Island Mortg. Corp.*, 555 F.3d 298 (2d Cir. 2009)................................................ 25

*Ahmed v. T.J. Maxx Corp.*, 103 F. Supp. 3d 343 (E.D.N.Y. 2015)................................................ 15

*Arthur v. Atkinson Freight Lines Corp.*, 164 F.R.D. 19 (S.D.N.Y. 1995) .................................... 24

*Brick v. HSBC Bank USA*, No. 04-CV-0129E(F),
2004 WL 1811430 (W.D.N.Y. Aug. 11, 2004)...................................................................... 17, 18

*Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991) .................................................................... 16, 18

*Cine Forty–Second Street Theatre Corp. v. Allied Artists Pictures Corp.*,
602 F.2d 1062 (2d Cir.1979) ................................................................................................... 27

*City of N.Y. v. Beretta U.S.A. Corp.*, No. 00-CV-3641JBWCLP,
2005 WL 1279183 (E.D.N.Y. May 26, 2005) ........................................................................ 15

*Deskcenter USA, Inc. v. Deskcenter Solutions, AG*, No. CV 14-5295,
2016 WL 825390 (E.D.N.Y. Feb. 11, 2016) .......................................................................... 18

*Design Strategy, Inc. v. Davis*, 469 F.3d 284 (2d Cir. 2006)......................................................... 22

*DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124 (2d Cir. 1998) ................................. 18, 19

*Dorsett v. Cty. of Nassau*, No. CV 10-01258, 2012 WL 2076911
(E.D.N.Y. June 7, 2012)........................................................................................................... 25

*Handschu v. Police Dep't of the City of N.Y.*, 679 F. Supp. 2d 488
(S.D.N.Y. 2010) ....................................................................................................................... 17

*Hooks v. Forman Holt Eliades & Ravin LLC*, No. 11 CIV. 2767,
2015 WL 5333513 (S.D.N.Y. Sept. 14, 2015) ....................................................................... 23

*In re Plumeri*, 434 B.R. 315 (S.D.N.Y. 2010)................................................................................ 17

*In re Sanchez*, No. 1:16-CV-05522-FB, 2017 WL 2222922
(E.D.N.Y. May 19, 2017).................................................................................................... 16, 17

*Izzo v. ING Life Ins. & Annuity Co.*, 235 F.R.D. 177 (E.D.N.Y. 2005)....................................... 27

*Koehl v. Greene*, 424 F. App'x 61 (2d Cir. 2011) ........................................................................ 18

*Lavi v. City of N.Y.*, No. 05 CIV 8007, 2007 WL 1573904
(S.D.N.Y. May 24, 2007) ............................................................................... 19

*Metro. Opera Ass'n, Inc. v. Local 100, Hotel Emps. & Rest. Emps. Int'l
Union*, 212 F.R.D. 178 (S.D.N.Y. 2003) ...................................................... 19

*Mickle v. Morin*, 297 F.3d 114 (2d Cir. 2002) ................................................. 18

*Monaghan v. SZS 33 Assocs., L.P.*, 148 F.R.D. 500 (S.D.N.Y. 1993) ............. 25

*New World Solutions, Inc. v. NameMedia Inc.*, 150 F. Supp. 3d 287
(S.D.N.Y. 2015) ............................................................................................. 22

*Nieves v. City of N.Y.*, 208 F.R.D. 531 (S.D.N.Y. 2002) ................................ 25

*Oliveri v. Thompson*, 803 F.2d 1265 (2d Cir. 1986) ....................................... 16

*Ransmeier v. Mariani*, 718 F.3d 64 (2d Cir. 2013) ........................................ 18

*Reilly v. Natwest Markets Group Inc.*, 181 F.3d 253 (2d Cir.1999) ............... 25

*Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99
(2d Cir. 2002) ................................................................................................ 25

*Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First
LLC*, 280 F.R.D. 147 (S.D.N.Y. 2012) .................................................... 24, 27

*Tarlton v. Cumberland Cty. Corr. Facility*, 192 F.R.D. 165 (D.N.J.2000) .... 19

*Tse v. UBS Fin. Servs., Inc.*, 568 F. Supp. 2d 274 (S.D.N.Y. 2008) .............. 22

*United States v. Brow*, No. 01-CV-4797, 2011 WL 7562706
(E.D.N.Y. Dec. 28, 2011) ............................................................................. 17

*United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen &
Helpers of Am., AFL-CIO*, 948 F.2d 1338 (2d Cir. 1991) ......................... 16

*United States v. Seltzer*, 227 F.3d 36 (2d Cir. 2000) ......................... 16, 17, 18

*Wilder v. GL Bus Lines*, 258 F.3d 126 (2d Cir. 2001) .................................... 16

*Zee-Bar, Inc. v. Kaplan*, 162 F.R.D. 422 (D.N.H. 1993) ............................... 15

**Statutes and Rules**

Fed. R. Civ. P. 26(a) ................................................................ 4, 14, 22, 23, 24

Fed. R. Civ. P. 26(e) ................................................................ 14, 22, 23, 24

Fed. R. Civ. P. 37(b) ................................................................ 14, 22

Fed. R. Civ. P. 37(c) ................................................................ 14, 22

Fed. R. Civ. P. 72(a) ................................................................ 15

Fed. R. Evid. 801(d)(2) ................................................................ 23

## PRELIMINARY STATEMENT

This is a civil rights action for false arrest and excessive force.  On the night that NYPD officers assaulted Plaintiff Allen Brown, the Internal Affairs Bureau ("IAB") audio-recorded a comprehensive interview of Mr. Brown (the "Recording") and thereby preserved his contemporaneous, blow-by-blow account of his beating.  Defendants withheld the Recording throughout discovery.  They did so despite Plaintiff's repeated requests for its disclosure and frequent expressions of concern about being sandbagged with it later.  Indeed, Defendants failed to take the most basic and obvious steps to find the Recording while falsely representing that it did not exist.

A month after the close of discovery, and well after Plaintiff's own deposition—at which defense counsel aggressively and hostilely questioned him about the subject matter of the Recording— Plaintiff's fear of being sandbagged was realized.  An IAB detective who had made the Recording acknowledged its existence during his deposition.  The Recording had thus always been available through a simple phone call.  Still, defense counsel did not disclose it.  He finally did so two months later, following a post-discovery conference.

Based on this misconduct, Plaintiff moved for sanctions.  He contended he had been severely prejudiced by not having the Recording to refresh his recollection when he was deposed more than two years after the incident and to guide his counsel's deposition of the Defendants.  Following full briefing, Magistrate Judge Ramon Reyes found that Defendants acted "at the very least" with "negligence, if not negligence so gross as to be willful."  Concluding that he need not find bad faith before imposing sanctions, he did not reach that issue.  Although he declined to strike relevant portions of Defendants' answer as Plaintiff had requested, he did (1) preclude Defendants from using Mr. Brown's original deposition either on motion or at trial, (2) permit Defendants to redepose Mr. Brown (and extended discovery for 30 days for that purpose), and

(3) order Defendants to pay Mr. Brown's fees and costs for his original deposition and the sanctions motion.

Defense counsel now objects to Judge Reyes's order.  Counsel claims in his memorandum, as he did before Judge Reyes, that he conducted good-faith searches for the Recording throughout the litigation.  However, he submits no declaration of his own, or of any other City official with personal knowledge, establishing that he ever made any specific request for the Recording, until *after discovery had closed*.  Counsel blames his earlier failure to locate the Recording on his own client's record-keeping error, but does not explain why, when his general request for IAB's file failed to turn up a recording, he didn't simply ask either of the two detectives who had recorded the interview—both of whom he represented at their depositions— whether they had made a recording.  Indeed, by experienced counsel's own admission, he *knew* that IAB's general practice is to audio-record or, if not, to take handwritten notes of an initial interview of a complainant, yet he insists that it was reasonable for him to assume there was no recording and no notes.

Counsel also implies that Judge Reyes explicitly found he did not act in bad faith when, in fact, Judge Reyes suggested there was bad faith but didn't reach the issue.  Then, contending that a finding of bad faith is required to impose sanctions under the court's inherent authority, counsel disregards binding Second Circuit case law holding that mere negligence, in certain situations, is enough.

Because Judge Reyes's order was supported by the facts and by well-established law, and under the deferential standard of review that applies, this Court should overrule Defendants' objections and affirm Judge Reyes's order.  If necessary to its decision, it should go on to make the unpleasant finding of bad faith that Judge Reyes didn't believe he had to make.  Defense

counsel's conduct throughout this litigation, including his insistence that a finding of negligence alone is not enough, has forced such a finding upon himself.

## RELEVANT FACTUAL BACKGROUND

**A.    The Incident and the Early Investigation**

On June 27, 2014, Plaintiff Allen Brown, a young African-American man, and at the time a 21-year-old college student, was in the back seat of a car that police stopped in Brooklyn, New York.  *See* Amended Complaint ("Compl."), Dkt. 15, ¶ 17.  Mr. Brown knew the front-seat passenger but not the driver, who, for unknown reasons, sped off from the stop. Ex. A, at 81[1]; Compl. ¶ 18.  When the driver finally stopped several blocks away, he and the other passenger ran, and a panicked Mr. Brown, fearing the reaction of police and in a strange neighborhood, also fled.  *See id.* ¶¶ 19, 20.  Mr. Brown hid in a dark stairwell outside of 266 Martense Street.  Ex. A at 130, 133.  Defendants, along with other NYPD officers, found Mr. Brown and, vindicating Mr. Brown's fears, punched, dragged, and kicked him even though he was totally cooperative and did not resist arrest.  *See* Compl. ¶¶ 21-22, 28.  The beating was so severe that Mr. Brown, cut and bruised and bleeding from a severe gash to his scalp, was taken to the hospital.  *See id.* ¶ 23.

Before Mr. Brown received treatment, including staples to his scalp, IAB Detectives Christophe and Meehan questioned him as he lay shackled in his hospital bed (the "Hospital Interview").  *See* Exs. B, C.  Mr. Brown received no written record or recording of his statements.  The detectives wrote a formal report of the interview (the "Hospital IAB Worksheet").  *See* Ex. C.[2]

---

[1] Unless otherwise noted, all citations marked "Ex." refer to the exhibits listed in paragraph 2 of the Rudin Declaration filed with this memorandum, dated November 20, 2017.

[2] After Mr. Brown was finally treated, he was taken to Brooklyn Criminal Court and charged with trespass, resisting arrest, and related offenses.  Compl. ¶¶ 26, 30.  On or about February 3, 2015, all charges were dismissed per an agreement to adjourn the case in contemplation of dismissal.  *Id.* ¶ 31.

On September 23, 2014, IAB conducted a second interview of Mr. Brown—this time with IAB's Sgt. Reiser questioning Mr. Brown at the office of his present counsel (the "Office Interview").  *See* Ex. D.  Counsel would not permit Sgt. Reiser to audio record the interview, "so [Sgt. Reiser] took notes."  *Id.* at 1.  Defendants eventually disclosed that Sgt. Reiser had scribbled these notes in the margins of the Hospital IAB Worksheet.  *See* Ex. E.

## B.    Pleadings, Initial Disclosures, and Initial Discovery Requests

Mr. Brown filed this lawsuit on July 31, 2015.  *See* Complaint, Dkt. 1.  He alleged state and federal civil rights claims, including false arrest and excessive force.  In their answer of November 4, 2015, Defendants denied Plaintiff's allegations and raised 13 affirmative defenses, including that Plaintiff's "own culpable or negligent conduct" contributed to his injuries, that Defendants acted in "the reasonable exercise of proper and lawful discretion," and that "Plaintiff provoked any incident that occurred."  Dkt. 13 at ¶¶ 3, 4, 6.[3]

On November 16 and 17, 2015, the parties exchanged Rule 26(a) disclosures.  Despite being required to identify or disclose "documents" or "tangible things" that they "may use to support [their] claims or defenses," Fed. R. Civ. P. 26(a)(1)(A)(ii), Defendants failed to reveal *any* statements that Mr. Brown had made to IAB, including any audio recording.  *See* Ex. F.  On November 17, 2015, in a Rule 34 discovery demand, Plaintiff requested, among other things, "[a]ll written or recorded statements taken by defendants [or] someone acting on any defendant['s] behalf, relating to Plaintiff's arrest[]."  Ex. G at 9 ¶ 12.  Defendants responded on January 27, 2016, omitting most of the IAB investigation file and providing no audio recordings.

---

[3] The parties amended their complaint and answer on December 31, 2015, and March 30, 2016, respectively.  *See* Dkt. 15, 23.  The amended complaint added named defendants, but did not change the substance of the allegations.  Defendants raised the same affirmative defenses in their amended answer.

C.      **Defendants' Stonewalling During Discovery**

At a March 30, 2016, status conference before Judge Reyes, defense counsel said he would produce the entire IAB file to Plaintiff "[w]ithin a week, less than a week."  Dkt. 24 at 8 (transcript).  Three weeks later, on April 22, Plaintiff's counsel wrote to Judge Reyes that defense counsel "still ha[d] not provided" this discovery.  Dkt. 25 at 1.  Because defense counsel "ha[d] continually made th[e] promise [to turn over the files] and they ha[d] not been produced," *id.*, Plaintiff's counsel asked the Court to order Defendants to produce the discovery, *id.* at 2.

Defense counsel responded, in a May 2 letter, that "the final portion of the file was produced this morning"—33 days after his promise to disclose the records "within a week."  Dkt. 26 at 1.  Plaintiff's counsel responded the next day, May 3, pointing out that Defendants had not, in fact, produced the final portion of the IAB file, as the disclosed documents still contained "no handwritten notes of any of the interviews the IAB investigators conducted with plaintiff."  Dkt. 27 at 1.  On May 4, Plaintiff's counsel wrote to defense counsel specifically asking for Sgt. Reiser's "handwritten notes" from the Office Interview and "notes and any recording" from when "Det. Christophe interviewed Mr. Brown on June 27, 2014" at the hospital.  Ex. H at 1.

During a May 5, 2016, telephone conference with Judge Reyes, defense counsel represented that "the IAB file per say [sic] has been fully produced," Dkt. 56 at 4 (transcript), but Plaintiff's counsel repeated that he still did not have "notes of interviews with [his] client," *id.* at 3.  He made clear that he was seeking notes from two different IAB interviews of Mr. Brown: "[o]ne interview occurred the date of the incident and then another . . . was a follow-up interview that actually occurred in my office some time later."  *Id.*

In a joint status report submitted on May 27, 2016, Plaintiff's counsel stated that "[d]uring a telephone conference on May 4, Defendants agreed to provide IAB detectives' notes

of *at least two interviews with Plaintiff*." Dkt. 28 at 1 (emphasis added).  Defendants did not dispute this.

During a June 6, 2016, telephone conference, Plaintiff's counsel said he had assurances from defense counsel that "notes of interview of the plaintiff by IAB" were "going to be provided." Dkt. 43 at 3 (transcript).  Defense counsel said that he "should receive [the notes] within the next couple of weeks." *Id.* at 4.  Eighteen days later, on June 24, 2016, Plaintiff's counsel agreed to extend the discovery deadline, since "the City ha[d] indicated it need[ed] more time" to produce these records. Dkt. 30 at 1.  (The outstanding discovery also included the Defendants' disciplinary files.)

In summer 2016, counsel exchanged emails about the outstanding discovery.  On July 19, Plaintiff's counsel wrote, "why the delay in producing our client's statements to IAB? . . .  It's very prejudicial to our client's interests." Ex. I.  On July 20, apparently referring to the Office Interview, defense counsel wrote that there were no notes "*because audio-recordings are kept in lieu of notes so they are the only records of interviews*." Ex. J at 3 (emphasis added).  Plaintiff's counsel responded that he had been at the Office Interview and had seen Sgt. Reiser taking handwritten notes. *Id.* at 2.  On July 21, defense counsel acknowledged that may have been true, since it was "[his] understanding that [it] is *either one (audio-recording) or the other (notes) but never both*." *Id.* (emphasis added).

At another telephone conference, on August 4, 2016, Plaintiff's counsel informed the Court that notes from the IAB interviews of Mr. Brown had still not been provided, even though it had been "three months since [the] May 4th [telephone call] when Mr. Ashanti agreed to provide these files." Dkt. 44 at 4 (transcript).  Defense counsel then announced that he had, in fact, obtained IAB notes from the Office Interview but that he had "not yet really decided"

whether to turn them over since, in his view, "deliberative process privilege is involved." *Id.* at

5. Besides disagreeing that IAB notes of an interview with the Plaintiff could possibly be

"privileged," Plaintiff's counsel expressed his fear of being sandbagged: "*I just don't want to be*

*in a position of having my client testify at a deposition and then find out that at some point that*

*he is going to be impeached with some statement that he made to IAB that we didn't have*." *Id.* at

14 (emphasis added). Judge Reyes ordered Defendants to submit the Office Interview notes for

in-camera review, and, regarding the other discovery, told defense counsel that if it was not

produced by September 16, there would be "[p]ossible sanctions." *Id.* at 10, 15. On August 30,

defense counsel wrote to the Court that the "notes" from the Office Interview actually had been

produced already, in redacted form, as NYC185. Dkt. 31 at 1.[4]

  In an August 31 letter to Judge Reyes, Plaintiff's counsel voiced his frustrations with

defense counsel's delays and obfuscations. *See* Dkt. 32.[5] Cutting through the confusion around

NYC185, he made it crystal clear that Plaintiff was "entitled to a definitive response of whether

there ever were handwritten notes of *either or both interviews (and a tape of the first interview)*."

*Id.* at 2 (emphasis added).[6] Further, voicing concerns that would prove prescient, he wrote:

> *I am concerned about being sandbagged.* My client should not have to submit to a
> deposition without the opportunity to review all his statements. He should not be
> required to testify without such statements, *only to have them miraculously surface later*

---

[4] NYC185 is the formal Hospital IAB Worksheet—dated June 27, 2014—with the main text, and Sgt. Reiser's handwritten September 23 margin notes, entirely redacted. *See* Ex. K. Anyone looking at NYC185 would conclude it was simply a formal report of the Hospital Interview. Defense counsel never explained that Sgt. Reiser's notes had been filled in on a copy of the Hospital IAB Worksheet.

[5] Because defense counsel had not explained that NYC185 contained Sgt. Reiser's handwritten notes from the Office Interview scribbled on the Hospital IAB Worksheet, Plaintiff's counsel understood defense counsel to be calling the Hospital IAB Worksheet "notes," and mistakenly identified Sgt. Reiser as the person who interviewed Plaintiff at the hospital. Dkt. 32 at 2.

[6] The letter implied that where there is a formal report, there must be either handwritten notes or a recording, for police officers do not just prepare detailed formal interview reports from memory. Indeed, defense counsel had conceded as much in his July 21 email in which he expressed his understanding that "*either one (audio-recording) or the other (notes)*" are created after IAB interviews. Ex. J at 2.

and be used to impeach him if there are any inconsistencies after the passage of so much time.  For this reason, I have asked Mr. Ashanti to stipulate that the defendants will not use, for any purpose in the lawsuit, any undisclosed notes or statements of Mr. Brown.  He has refused to do so.  We request the Court to enter such an order.

*Id.* (emphases added).

On September 9, 2016, Judge Reyes ordered Defendants to produce an unredacted copy of NYC185 and, that same day, Plaintiff's counsel sent an email to defense counsel confirming that defense counsel had "agreed to see if there are notes (*or a tape recording*) by the other detective, who interviewed Mr. Brown on June 27 following his arrest"—i.e., the Hospital Interview.  Ex. L (emphasis added).  Defense counsel replied, "That's correct."  *Id.*[7]

## D.    Depositions

On November 10, 2016, with Defendants still representing that no notes or recording of the Hospital Interview existed, and with Plaintiff having received what appeared to be all other IAB records, Mr. Brown appeared for his deposition.  *See* Ex. A.  Mr. Brown could not remember whether the Hospital Interview had been recorded or the specific questions the IAB officers asked him.  *Id.* at 191-92.  Plaintiff's counsel then deposed Defendants.  *See* Ex. M.  Plaintiff's counsel asked many questions aimed at determining which defendant took which actions, relying largely on the discovery that Defendants had represented to be complete.

On December 21, 2016, and February 7, 2017, Plaintiff deposed the two IAB detectives who had conducted the Hospital Interview.  In the December 21 deposition, Det. Christophe

---

[7] At another status conference, on October 18, 2016, Plaintiff's counsel recounted how he had agreed to visit the Law Department office to inspect personnel files that the Court had ordered Defendants to disclose, and for which—for the first time in the litigation, and after the parties had exchanged voluminous other discovery—defense counsel had insisted on pre-payment of 25 cents per page for photocopying.  *See* Dkt. 45 at 3-4.  Plaintiff's counsel, while stunned by this pettiness, had mailed a check for $31.25 and received confirmation that it had been delivered.  *Id.* at 4.  Defense counsel maintained that he had never received the check.  *Id.* 4-6.

testified that he "would have had" a tape recorder at the interview and that he "very likely" had recorded the discussion, per his "usual practice."  Ex. N at 14, 16.  Plaintiff's counsel promptly asked Defendants, still again, to disclose the Recording.  Defense counsel responded that Christophe "did not testify with certainty that there was a recording," and that Defendants had produced "all the audio recordings," but he begrudgingly agreed to "make another request."  *Id.* at 16.  At the February 7 deposition, Det. Meehan *did* specifically remember recording Mr. Brown.  *See id.* at 34.  Following that deposition, on February 13, 2017, Plaintiff's counsel wrote to defense counsel yet again to request the Recording.  *See* Ex. O.

Discovery closed on March 2, 2017.  Defendants still had not produced the Recording.

**E.      Defendants Finally Produce the Recording**

At a pretrial conference on March 2, 2017, Plaintiff's counsel reminded the court that Plaintiff had requested the Recording, whose existence was now confirmed, "throughout the case."  Dkt. 47 at 3 (transcript).  Defense counsel responded that this "d[id]n't comport with what actually happened," insisting falsely that the many months of wrangling had concerned only the Office Interview notes.  *Id.* at 6.  He did this despite Plaintiff's counsel's unambiguous insistence in his letters or emails of May 3, May 4, May 27, August 31, and September 9, and at the conference of May 5, that he was requesting IAB notes from both the Hospital Interview and the Office Interview (or audio recordings from the Hospital Interview).  Defense counsel then acknowledged—more than 15 months after initial disclosures and after Plaintiff had first requested all recordings—that the Recording existed and said he had "been making diligent efforts to obtain" it for "more than 30 days."[8]  *Id.* at 7, 9.  The court directed that the Recording

---

[8] In an affidavit filed by Defendants, Lt. James Koschmerl of IAB states that he was asked in "March of 2017" to find the Recording.  Dkt. 53-7 at 4 ¶ 12.  It thus appears unlikely that defense counsel had, on March 2, been searching for the Recording for more than 30 days.

be disclosed.  *Id.* at 10.  It took another five weeks before Defendants finally disclosed the Recording, on April 5, 2017.

F.   **The Significance of the Recording**

The Recording is 29 minutes long.  Its content contradicts significant details in the Hospital IAB Worksheet and adds information the worksheet omitted.  *See* Ex. P.[9]  It contains many details that Mr. Brown either did not recall during his deposition, given more than two years after the incident, or recalled in a different way.  We first compare the Recording to the Hospital IAB Worksheet.  As to **what happened during the assault:**

- Mr. Brown said in the Recording that he ran from the car because he was "scared."  Ex. P at 2.  The Hospital IAB Worksheet omitted this detail.

- Mr. Brown said in the Recording that, to the extent he did lose consciousness, he regained it "behind a cop vehicle now with my head leaned up against the bumper."  Ex. P at 3.  The Hospital IAB Worksheet states he woke up "in the back of the RMP bleeding."  Ex. C at 1.

As to **what caused Mr. Brown's injuries:**

- In the Recording, Mr. Brown gave as the "reason why [he] need[ed] staples" in his head that a specific officer had punched and kicked him in the head.  Ex. P at 6.  He also described a "huge scratch" on his right arm from being dragged, *id.* at 4, and recalled having his chin being "repeatedly jammed into the concrete steps" and having his "tooth chipped from them bashing my head onto the concrete," *id.* at 3.  The Hospital IAB Worksheet contains none of these important details.

- In the Recording, Mr. Brown, asked if he "tripped," said, "No, he grabbed me up the stairs, so I'm trying to gain my steps coming upstairs, and my foot slipped on one of the stairs and I fall."  Ex. P at 4.  The Hospital IAB Worksheet states that "[o]ne of the officers grabbed him by the shirt and he slipped."  Ex. C at 1.

As to **Mr. Brown's identification of the police officers involved:**

---

[9] Defendants did not provide a transcript of the recording.  Plaintiff's counsel prepared a transcript, which is attached as Exhibit P to the Rudin Declaration.  Counsel will provide the recording itself to the Court upon request.

- In the Recording, Mr. Brown specifically remembered Defendant Richiez's involvement with his processing and transportation to the hospital, Ex. P at 7, but the Hospital IAB Worksheet omits this.

- In the Recording, Mr. Brown said he "think[s]" one officer had blond hair and another "brunette-blondish" hair.  Ex. P at 6-7.  The Hospital IAB Worksheet states that he definitively described them both as having "blonde" hair.  Ex. C at 1-2.

- In the Recording, Mr. Brown identified a photograph of Defendant Garcia, describing him as the officer with the "[g]ray and yellow sneakers."  Ex. P at 14.  The Hospital IAB Worksheet contains no details about Garcia's sneakers.  Ex. C. at 3.

At the end of the Hospital Interview, the officers asked Mr. Brown to sign a HIPAA release, which he declined to do.  Mr. Brown asked the officers if he could go home.  They said he would have to see a judge first, and after thus increasing his anxiety, they offered him a form to withdraw his IAB complaint, which Mr. Brown declined to sign.  Ex. P at 15-16.  This effort by the IAB detectives to manipulate Plaintiff into withdrawing his complaint was not known to Plaintiff's counsel, who did not inquire about it at their depositions.

Plaintiff's lack of access to the Recording as a tool to refresh his recollection before his deposition plainly affected his testimony as well as his attorney's questioning of the Defendants at their examinations.  At Plaintiff's deposition, defense counsel closely questioned Mr. Brown about the nature of his injuries and how he had received them.  Mr. Brown described Defendant Garcia as wearing black and blue sneakers, contrary to his statement at the hospital.  *Compare* Ex. A at 32, *with* Ex. P at 15.  He could not name any other officer, and he could not remember certain other details, such as how many officers were in street clothes versus uniforms.  *Compare* Ex. A at 173, *with* Ex. P at 5 ("[T]hey all pretty much had streetclothes on.").  Defense counsel asked Mr. Brown five different times if he "lost consciousness" during the incident, to which he finally replied that he had not.  *Compare* Ex. A at 146-47, *with* Ex. P at 3 (thinking that he "maybe" did lose consciousness).  Although Mr. Brown testified that his injuries were, generally,

11

from the dragging, punching, and kicking by the Defendants, contrary to his audio-recorded interview, he was unable to specifically remember how he received the head injury, nor could he remember how many times he was punched or kicked. *Compare* Ex. A at 143-46, 160-65, 184, *with* Ex. P at 6. Defense counsel made this last issue a central feature of the deposition, asking Mr. Brown at least *24 times* how many times he was punched or kicked. Ex. A at 143-46, 160-65, 181.

At Defendants' depositions, lacking the Recording, Plaintiff's counsel asked Officer Garcia about what he did when he saw Plaintiff on the stairs, but did not ask him about his clothing. Ex. M at 19-21. Not knowing about the descriptions contained in the Recording, Counsel did not ask Garcia the color of his sneakers or whether they had blood on them, nor did he ask Richiez and Smith about their sneakers.

## G.    Magistrate Judge Reyes Grants Plaintiff's Motion for Sanctions

On May 30, 2017, Plaintiff moved for sanctions based on Defendants' inexcusable delay in disclosing the Recording and the prejudice it caused Plaintiff. *See* Dkt. 50, 51. Plaintiff requested that the Court, in accordance with Fed. R. Civ. P. 26 and 37, or under its inherent authority to impose sanctions, strike Defendants' answer, preclude Defendants from using Plaintiff's deposition testimony or the Recording for any purpose, and order Defendants to pay the attorneys' fees Plaintiff had incurred due to the discovery violation. *See* Dkt. 51 at 17-23.

In response, defense counsel deflected all responsibility for the delay, blaming it entirely on "a clerical oversight" that thwarted his "diligent searches." Dkt. 54 at 2. His sole source of support for this argument was an affidavit signed by IAB Lt. James Koschmerl (and presumably written by defense counsel) that utterly fails to document a single timely effort to obtain any notes or audio recording of Plaintiff's post-incident interview. Lt. Koschmerl states that IAB

12

Group 9 had conducted the Hospital Interview and then turned over the investigation to IAB
Group 54; he then, without providing the basis of his knowledge, asserts that Group 9 had failed
to upload the Recording to the case file. Dkt. 53-7 at ¶¶ 6, 8. He further states that "*[i]t is [his]
understanding*"—i.e., he does not have personal knowledge—that the Law Department first
requested the case file in March 2016. *Id.* ¶¶ 3, 7 (emphasis added). In paragraph 10 of the
affidavit, which defense counsel repeatedly cited as the sole evidence that he conducted diligent
searches, Lt. Koschmerl vaguely explains that "additional requests from the Law Department
to . . . Group 54 . . . netted the same results as the initial request, *i.e.* a response that no such
audio-recording existed." *Id.* ¶ 10. Again, he mentions no basis for this claim and provides no
details about the timing or the form of these alleged requests. In the only assertion in the
affidavit—or in any of the papers submitted by defense counsel—that constitutes a sworn
statement of personal knowledge about efforts to find the Recording, Lt. Koschmerl states that
"in March of 2017" (discovery closed on March 2, 2017) he "was asked to conduct a search of
Group 9's records," and that he was then "able to locate the audio requested." *Id.* 4 ¶ 12.[10]

Plaintiff replied to Defendants' memorandum on July 13, 2017. *See* Dkt. 55. In addition
to highlighting defense counsel's various misstatements of the record, Plaintiff pointed out (as he
does again now) that defense counsel had provided no "specifics regarding [any] search or
searches," and no documentation of any searches: "no letters, no emails, no faxes, nothing."
Dkt. 55 at 4. Further, defense counsel did "not explain why [he] never took the simple step of
*asking the IAB officers themselves if they had made a recording*." *Id.* (emphasis in original).

---

[10] In his memorandum, defense counsel cited Lt. Koschmerl's affidavit for the propositions that
Defendants first requested the IAB file in March 2016, Dkt. 54 at 6, even though that assertion in the
affidavit is based only on Lt. Koschmerl's "understanding"; that they "conducted additional searches for
any audio-recording" in September 2016, *id.* at 5, even though the affidavit does not say that; and that
they conducted some unspecified number of "additional requests" on some unspecified dates, *id.* at 5-7.

On October 11, 2017, Magistrate Judge Reyes granted Plaintiff's motion for sanctions. *See* Dkt. 58 at 1-2. He noted that sanctions were not available under Rule 37(b), since "the Court never issued an express order requiring the production of the IAB Audio." *Id.* at 4 n.1. He also concluded that Rule 37(c)(1) did not authorize sanctions, since "Defendants['] obligation to disclose the IAB Audio did not arise under Rule 26(a)," as "the tape is not something Defendants would use to support their defenses," or Rule 26(e), as "they did not learn in a timely manner that their initial disclosure was 'incomplete or incorrect.'" *Id.* at 5 n.2. Still, Judge Reyes wrote, the Court could impose sanctions "under its inherent power to manage its own affairs." *Id.* at 4 n.1 (internal quotation marks omitted). And it could do this without finding "[b]ad faith or willful misconduct"; "[n]egligence may suffice." *Id.* at 4-5.

Judge Reyes then found that Defendants' withholding of the Recording "was *at the very least* the product of negligence, *if not negligence so gross as to be willful*." *Id.* at 5 (emphases added). He found that "Defendants failed to conduct a diligent search" for the Recording, even though "[i]t would have been relatively simple . . . to ask the two officers from Group 9 whether they recorded the interview as per IAB protocol," and to do so "early during discovery." *Id.* And he found that Defendant's misconduct had prejudiced Mr. Brown by "depriv[ing] him of an opportunity to refresh his memory prior to his own deposition . . . [and] of information that might have guided discovery, especially as it related to the Officer[s'] depositions." *Id.* at 6.

As for the appropriate sanctions, Judge Reyes precluded Defendants from using Mr. Brown's deposition testimony on motion or trial, while giving them 30 days to redepose Mr. Brown (without referencing his first deposition). *Id.* Further, "in light of the *remarkable lack of diligence exhibited by the Defendants* and the additional costs created by bringing this motion

and redeposing Brown," Judge Reyes held Defendants "liable for the cost of the original deposition and of bringing this motion." *Id.* (emphasis added).

On October 25, 2017, Defendants objected to Judge Reyes's order under Fed. R. Civ. P. 72(a). *See* Dkt. 61, 62. They argued that Judge Reyes lacked the authority to impose sanctions under the Court's inherent power absent a finding of bad faith, and that they had not acted in bad faith. *See* Dkt. 61 at 6-12. They also argued that, in any case, the sanctions Judge Reyes granted were unwarranted, *see id.* at 12-19, and that, at most, Mr. Brown's deposition should be reopened for the limited purpose of allowing him to testify about the Recording, *see id.* at 19-20.

## ARGUMENT

### A.    Standard of Review

"A party may serve and file objections" to a magistrate judge's nondispositive order, but the district judge may reverse or modify the order only if it "is clearly erroneous or is contrary to law." Fed. R. Civ. P. 72(a). A decision is clearly erroneous if "the district court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Ahmed v. T.J. Maxx Corp.*, 103 F. Supp. 3d 343, 350 (E.D.N.Y. 2015) (Spatt, J.) (internal quotation marks omitted). "This standard is highly deferential, imposes a heavy burden on the objecting party, and only permits reversal where the magistrate judge abused his discretion." *Id.* (internal quotation marks omitted). A decision is "contrary to law" only if "the magistrate fail[ed] to apply or misapplie[d] relevant statutes, case law or rules of procedure." *Id.* (internal quotation marks omitted).

A court may uphold a magistrate judge's ruling on alternative grounds supported by the record. *See City of N.Y. v. Beretta U.S.A. Corp.*, No. 00-CV-3641, 2005 WL 1279183, at *1 (E.D.N.Y. May 26, 2005) (Weinstein, J.); *Zee-Bar, Inc. v. Kaplan*, 162 F.R.D. 422, 426-27 (D.N.H. 1993).

**B.      Contrary to Defendants' Misstatement of the Law, Imposing Sanctions Pursuant to the Court's Inherent Power Does Not Always Require a Finding of Bad Faith**

In the Second Circuit, a court need not find bad faith before imposing sanctions for "misconduct that is not undertaken for the client's benefit." *United States v. Seltzer*, 227 F.3d 36, 42 (2d Cir. 2000). While previously the Second Circuit appeared to expect a "showing of bad faith to justify the use of the court's inherent power" to impose sanctions, *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 948 F.2d 1338, 1345 (2d Cir. 1991), the Court explicitly disclaimed any such general rule in *Seltzer*. Rather, seeking to "clarify the circumstances under which a district court has the power to sanction pursuant to its inherent authority without a finding of bad faith," the *Seltzer* Court held:

> When a district court invokes its inherent power to impose attorney's fees or to punish behavior by an attorney . . . taken on behalf of a client, the district court must make an explicit finding of bad faith. But, when the district court invokes its inherent power to sanction misconduct by an attorney that involves that attorney's violation of a court order or other misconduct that is not undertaken for the client's benefit, the district court need not find bad faith before imposing a sanction under its inherent power.

*Seltzer*, 227 F.3d at 41-42 (citations and internal quotation marks omitted).

The Court explained that a bad-faith requirement aims "[t]o ensure . . . that fear of an award of attorneys' fees against them will not deter persons with colorable claims from pursuing those claims." *Id.* at 40 (quoting *Oliveri v. Thompson*, 803 F.2d 1265, 1272 (2d Cir. 1986)). Thus, bad faith is "a prerequisite" for sanctions only for "conduct of the sort that is normally *part of the attorney's legitimate efforts at zealous advocacy for the client*." *Id.* (emphasis added). But when the conduct "involve[s] a lawyer's *negligent or reckless* failure to perform his or her responsibility as an officer of the court . . . , sanctions may be justified absent a finding of bad faith given the court's inherent power 'to manage [its] own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Id.* at 41 (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991)); *see also Wilder v. GL Bus Lines*, 258 F.3d 126, 130 (2d Cir. 2001); *In re Sanchez*,

16

No. 1:16-CV-05522, 2017 WL 2222922, at *3 (E.D.N.Y. May 19, 2017) (Block, J.) (affirming sanctions for counsel's "negligent disregard" and rejecting argument that court was required to make finding of bad faith); *In re Plumeri*, 434 B.R. 315, 329-30 (S.D.N.Y. 2010). "[F]ailure to produce documents during discovery," in particular, may be an instance of "a lawyer's negligent or reckless failure to perform his or her responsibility as an officer of the court" that warrants inherent-power sanctions. *United States v. Brow*, No. 01-CV-4797, 2011 WL 7562706, at *5 (E.D.N.Y. Dec. 28, 2011) (Azrack, M.J.).

Thus, in a case where counsel's repeated assurances that all responsive documents had been disclosed proved false, and a bankruptcy judge required counsel to pay the other side's attorneys' fees incurred as a result of this misconduct, the district court upheld the sanction, reasoning that "*Seltzer* provided authority to impose [these] sanctions . . . without a finding of bad faith" based on counsel's "*disregard of discovery obligations* and his derelictions as an officer of the court." *Brick v. HSBC Bank USA*, No. 04-CV-0129E(F), 2004 WL 1811430, at *3 & n.29 (W.D.N.Y. Aug. 11, 2004) (emphasis added).

Similarly, a district court ordered payment of "fees and expenses [that] would not have been incurred" but for an Assistant Corporation Counsel's failure to notify the plaintiffs of a change in the NYPD policy at the center of the litigation, holding that such misconduct, even if not amounting to bad faith, "cannot be said [to have been] 'undertaken for the client's benefit'"; "[q]uite the contrary: [c]ounsel's indulgence in meaningless litigation [over the old policy] imposed a cost on their client, it did not confer a profit." *Handschu v. Police Dep't of the City of N.Y.*, 679 F. Supp. 2d 488, 503-04 (S.D.N.Y. 2010) (quoting *Seltzer*, 227 F.3d at 42).

In this case, defense counsel has never has argued that withholding the Recording was deliberately undertaken for strategic reasons or for his clients' benefit. On the contrary, having

repeatedly promised to disclose such evidence, he has contended that "the only reason" he did not disclose it was that he was "unaware that it existed."  Dkt. 54 at 1-2.

Defendants mischaracterize the cases they cite for the erroneous proposition—which ignores the controlling authority of *Seltzer*—that bad faith is always a prerequisite for sanctions. *Ransmeier v. Mariani* says only that a court "may" impose inherent-power sanctions upon a finding of bad faith, not that bad faith is a categorical prerequisite for such sanctions.  718 F.3d 64, 68 (2d Cir. 2013).  The same is true of *Koehl v. Greene*, 424 F. App'x 61, 62 (2d Cir. 2011); *Mickle v. Morin*, 297 F.3d 114, 125 (2d Cir. 2002); and *Deskcenter USA, Inc. v. Deskcenter Solutions, AG*, No. CV 14-5295, 2016 WL 825390, at *6 (E.D.N.Y. Feb. 11, 2016) (Brown, M.J.).  And *Chambers* certainly did not overrule *Seltzer*, for *Seltzer* itself cited and grappled with *Chambers*, and determined that it did not categorically require a finding of bad faith before imposing inherent-power sanctions.  *See Seltzer*, 227 F.3d at 41.

In sum, Judge Reyes was well within his discretion, under the circumstances of this case he knew so well, to sanction Defendants for conduct by their counsel that amounted at the very least to negligence.  This Court should therefore affirm the order.

## C.   In Any Case, Defendants Did Act in Bad Faith

Judge Reyes, while implying defense counsel's bad faith, determined that he did not need to decide the question of mental culpability before imposing sanctions.  But the history of this litigation supports a finding of bad faith.

The Second Circuit has held that a magistrate judge's "finding that defendants had acted in 'conscious disregard of their discovery obligations'" may establish "a pattern of behavior which could reasonably be construed as a bad faith effort to thwart plaintiffs' discovery efforts." *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 136 (2d Cir. 1998); *see also Brick*, 2004 WL 1811430, at *3 (citing *DLC Mgmt. Corp.* for proposition that "[c]lear evidence of a

18

'conscious disregard' of one's discovery obligations is sufficient to find bad faith"). "In determining whether a party acted willfully or in bad faith, courts often focus on the history of the party's conduct in the entire case." *Lavi v. City of N.Y.*, No. 05 CIV 8007, 2007 WL 1573904, at \*5 (S.D.N.Y. May 24, 2007). In *DLC Management Corp.*, the Second Circuit upheld a finding of bad faith where the defendants had failed to turn over certain zoning maps and related records until after depositions had occurred and discovery had closed, even though the box containing the records was finally "found where it had always been—in a . . . closet *that defendants apparently had never bothered to search*." *DLC Mgmt. Corp.*, 163 F.3d at 135 (emphasis added).

In another instructive case, a district court found "ample evidence of willfulness and bad faith" in "counsel's repeated representations of full production" in response to opposing counsel's "high-decibel allegations of failure to make adequate inquiry and repeated demonstrations of incomplete compliance." *Metro. Opera Ass'n, Inc. v. Local 100, Hotel Emps. & Rest. Emps. Int'l Union*, 212 F.R.D. 178, 222, 224 (S.D.N.Y. 2003). Counsel had "professed full compliance—falsely and . . . without making a reasonable inquiry"—and had, just like present defense counsel, "*failed to ask important witnesses for documents*" in a timely manner. *Id.* at 222 (emphasis added); *see also id.* at 228 (maintaining that a "reasonable inquiry" requires counsel to contact "all employees and agents of the defendant potentially possessing responsive information"); *id.* at 222 (instructing that counsel cannot escape sanctions by blaming the client's record-keeping practices, since counsel has "a duty to explain to [his] client what types of information would be relevant and responsive to discovery requests and ask how and where relevant documents may be maintained" (quoting *Tarlton v. Cumberland Cty. Corr. Facility*, 192 F.R.D. 165, 170 (D.N.J.2000))).

19

In this case, disputing the clear evidence that he acted in bad faith, defense counsel offers not a single piece of competent evidence to support his repeated assertions that Defendants "conducted a 'diligent search' for the untimely-produced material" or that they "redoubled their efforts" to find the Recording after Det. Meehan's deposition. Dkt. 61 at 1, 5. He claims that "*[t]he record shows* that [they] repeatedly requested" files from IAB, that "*the evidence shows* that defendants made persistent and assiduous, good faith efforts to collect all relevant discovery material," and that they "*demonstrated* persistent, good faith efforts to collect all relevant discovery material." *Id.* at 11, 13, 15 (emphases added). What evidence? What demonstration? Counsel points to no documentary or testimonial evidence of any specific efforts anyone made before March 2017 to find the Recording.

Counsel makes special mention of alleged "further searches" Defendants conducted for the Recording, Dkt. 61 at 3, after explicitly agreeing once again to do so on September 9, 2016, *see* Ex. L, which was still two months before Mr. Brown's deposition. But defense counsel's histrionics aside, the only evidence he cites of any search is paragraph 10 of the Koschmerl affidavit. *See* Dkt. 61 at 11. And in paragraph 10, Lt. Koschmerl merely makes vague allusions to unspecified, unquantified, undated, and unattributed "additional requests to . . . Group 54," Dkt. 53-7 at ¶ 10; he provides no specifics or documentation of any search effort after September 9. Nor does defense counsel himself provide any such evidence in his own declaration, which is silent on the subject.

Defense counsel's claims that he had no inkling that a recording or notes from the Hospital Interview might exist are belied by his own admissions that he *knew* that IAB either audio-records or take notes of complainant interviews. *See* Ex. J at 3 (saying of another interview, "[t]here are no interview notes because audio-recordings are kept in lieu of notes so

20

they are the only records of interviews"); *id.* at 2 ("[I]t is my understanding [of IAB interviews] that [it] is either one (audio-recording) or the other (notes) but never both.").  When IAB Group 54 failed to produce either notes or an audio-recording of the Hospital Interview, counsel had to know that one or the other almost certainly existed.  Yet, obviously indifferent to his promises to find this out and to his discovery obligations, he never bothered to ask the Group 9 detectives, who had conducted the actual interview (and who were also his clients) and therefore knew for certain.  He couldn't be bothered.

Counsel's bad faith continues to this day, as he insists on repeating misstatements that are contradicted by documentary evidence.  He claims, for instance, that Plaintiff "did not request that defendants produce all written or recorded statements of plaintiff taken by defendants," Dkt. 61 at 2, even though Plaintiff's first Rule 34 discovery demand requests "[a]ll written or recorded statements taken by defendants . . . relating to plaintiff's arrests and/or prosecutions, and the surrounding circumstances," Ex. G at 9 ¶ 12, and even though Plaintiff corrected defense counsel's same misstatement when counsel made it to Judge Reyes, *see* Dkt. 54 at 3; Dkt. 55 at 2 n.4.  Defense counsel also claims, as he did before Judge Reyes, that "both parties believed that [unrelated recordings] were the only IAB audio recordings that existed," and that Plaintiff's counsel "memorialized in writing the parties' general understanding at the time that no audio recording existed of either of IAB's interviews with the plaintiff."  Dkt. 61 at 2-3; *see* Dkt. 54 at 3-4.  These assertions are plainly false.  In the email defense counsel cites, Plaintiff's counsel is clearly saying that he "do[es]n't see how there can be an audio recording of plaintiff" *from the Office Interview* with Sgt. Reiser, since Plaintiff's counsel himself "wouldn't let IAB record [his] client" on that occasion.  *See* Dkt. 53-3 at 1 (reproducing emails with subject line "Sgt. Scott Reiser Interview Notes").  Plaintiff's counsel understood that either notes or a recording of the

21

*Hospital Interview* must exist somewhere, and he therefore continuously insisted that Defendants produce one of these items, as is well documented above in this memorandum.

Defense counsel exhibited what Judge Reyes called a "remarkable lack of diligence" in searching for the Recording, Dkt. 58 at 6, and he has been otherwise remarkably uncooperative in his conduct of this litigation—from his delay in producing other discovery, to his disingenuous assertions of privilege, to his frequent misstatements of law and fact in the sanctions litigation. Should this Court determine that a finding of bad faith is necessary for it to affirm the imposed sanctions, it will have ample grounds for making such a well-deserved finding.

**D.    Alternatively, Because Rule 26(a) and (e) Required Disclosure of the Recording, Rule 37(c)(1) Authorized Sanctions, Without a Finding of Bad Faith**

Rule 37(c)(1) provides that "[i]f a party fails to provide information . . . as required by Rule 26(a) or (e)," the court may "order payment of the reasonable expenses, including attorney's fees, caused by the failure," and "impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi)."  Fed. R. Civ. P. 37(c)(1)(A), (C); *see also id.* 37(b)(2)(A) (listing the sanctions Judge Reyes imposed, among others); *Tse v. UBS Fin. Servs., Inc.*, 568 F. Supp. 2d 274, 321 (S.D.N.Y. 2008) (collecting cases showing that "[c]ourts in this circuit have often awarded attorneys' fees to sanction a party who disregards her discovery obligations").  "Rule 37(c)(1) is intended to prevent the practice of sandbagging an opposing party with new evidence."  *New World Solutions, Inc. v. NameMedia Inc.*, 150 F. Supp. 3d 287, 304 (S.D.N.Y. 2015) (internal quotation marks omitted).  A finding of bad faith is not required to impose Rule 37(c)(1) sanctions.  *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 296 (2d Cir. 2006).

Rule 26(a) requires each party, without awaiting a request, to provide all evidence that it "*may* use to support its claims or defenses, unless the use would be solely for impeachment." Fed. R. Civ. P. 26(a)(1)(A)(ii).

22

"Use" includes any use at a pretrial conference, to support a motion, or at trial.  The disclosure obligation is also triggered by intended use in discovery, apart from use to respond to a discovery request; use of a document to question a witness during a deposition is a common example.

Fed. R. Civ. P. 26 Advisory Committee Notes for 2000 Amendment.

Rule 26(e), in relevant part, requires a party

. . . who has made a disclosure under Rule 26(a)—or who has responded to a[] . . . request for production . . .—[to] supplement or correct its disclosure or response . . . in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing.

Fed. R. Civ. P. 26(e)(1)(A).

Here, Defendants were initially obligated to disclose the Recording under Rule 26(a), as it was plainly something that Defendants might have used to support their defenses.  Among the defenses claimed by Defendants are that Mr. Brown contributed to his own injuries, that Defendants acted reasonably and lawfully, that they did not violate Mr. Brown's rights, and that Mr. Brown isn't a credible witness.  These defenses hinge on how precisely the incident unfolded and the persuasiveness and credibility of Mr. Brown's account of it.  Additionally, a near-contemporaneous recording of a plaintiff describing his injuries in detail would, in any litigation, be crucial in pinning down and limiting the plaintiff's damages claim.  And every statement Mr. Brown made during the interview is potentially admissible on behalf of Defendants as a party admission.  *See* Fed. R. Evid. 801(d)(2).  The 29-minute Recording, in which Plaintiff discusses his encounter with Defendants on the very night it happened, plainly was something that Defendants "may use" in their defense.  *Cf., e.g.*, *Hooks v. Forman Holt Eliades & Ravin LLC*, No. 11 CIV. 2767, 2015 WL 5333513, at *6-7 (S.D.N.Y. Sept. 14, 2015) (defendant disputing a contractual claim cannot fail to disclose the underlying contract).

23

Defendants were also obligated to disclose the Recording in response to Plaintiff's Rule 34 discovery request, in which he asked for, among other things, "[a]ll written or recorded statements taken by defendants [or] someone acting on any defendant['s] behalf, relating to plaintiff's arrest[]." *See* Ex. G at 9 ¶ 12.

Since Defendants were thus obligated to disclose the Recording both in their initial disclosures "under Rule 26(a)," and in response to Plaintiff's "request for production," they were further obligated under Rule 26(e) to "supplement" both their initial disclosure and their Rule 34 response "in a timely manner" if they knew that "the disclosure or response [wa]s incomplete." Fed. R. Civ. P. 26(e)(1)(A).  As explained at length in this memorandum, defense counsel admits that he *knew* that whenever there is an IAB interview, as there was here, there will also be either an audio recording or notes.  Therefore, defense counsel knew all along during this litigation that Defendants' initial disclosures and discovery responses were incomplete until they disclosed either notes or a recording from the Hospital Interview.  Further, even if, *arguendo*, defense counsel did not *know* that either notes or a recording existed, Rule 26(a) and (e) obligated him "to turn over not only proper materials of which he [wa]s aware, but also those of which he reasonably *ought* to have been aware." *Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First LLC*, 280 F.R.D. 147, 156 (S.D.N.Y. 2012) (quoting *Arthur v. Atkinson Freight Lines Corp.*, 164 F.R.D. 19, 20 (S.D.N.Y. 1995) (emphasis in *Arthur*)).[11]

---

[11] After having already determined that he could impose sanctions pursuant to the Court's inherent power, Judge Reyes rejected Rule 26(a) and (e) as grounds for sanctions, stating that Defendants were not obligated to disclose the Recording under Rule 26(a) since it was "not something Defendants would use to support their defenses," or under Rule 26(e), since "Defendants did not learn in a timely manner that their initial disclosure was 'incomplete or incorrect.'"  Dkt. 58 at 5 n.2.  Plaintiff respectfully disagrees, for the above reasons.

**E.**     **The Particular Sanctions Judge Reyes Imposed Were Properly Within the Court's Discretion**

When selecting appropriate sanctions under either Rule 37 or the court's inherent power, the court's decision "is guided by a number of factors, including: '(1) the willfulness of the noncompliant party or the reasons for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance; and (4) whether the noncompliant party had been warned of the consequences of his noncompliance.'"  *Dorsett v. Cty. of Nassau*, No. CV 10-01258, 2012 WL 2076911, at *9 (E.D.N.Y. June 7, 2012) (Spatt, J.) (quoting *Nieves v. City of N.Y.*, 208 F.R.D. 531, 535 (S.D.N.Y. 2002)); *see Agiwal v. Mid Island Mortg. Corp.*, 555 F.3d 298, 302-03 (2d Cir. 2009); *see also Agence France Presse v. Morel*, 293 F.R.D. 682, 685 (S.D.N.Y. 2013) (citing as additional factors, when deciding whether to preclude evidence, "(1) the party's explanation for its failure to disclose, (2) the importance of the evidence, (3) the prejudice suffered by the opposing party, and (4) the possibility of a continuance").

Among the purposes of imposing sanctions are "ensur[ing] that a party will not be able to profit from its own failure to comply with the requirements of discovery," and providing both "a specific deterrent" and a "general deterrent effect in enforcing strict adherence to the responsibilities litigants owe to the court and their adversaries."  *Monaghan v. SZS 33 Assocs., L.P.*, 148 F.R.D. 500, 508 (S.D.N.Y. 1993).  Ultimately, "[w]hether exercising its inherent power, or acting pursuant to Rule 37, a district court has wide discretion in sanctioning a party for discovery abuses."  *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002) (quoting *Reilly v. Natwest Markets Group Inc.*, 181 F.3d 253, 267 (2d Cir.1999)).

Here, the above factors more than justify the sanctions that Judge Reyes imposed, and in fact warrant even stronger sanctions.  As Judge Reyes found, *see* Dkt. 58 at 6, defense counsel's discovery violations prejudiced Plaintiff by sandbagging him, just as Plaintiff's counsel had

openly feared, and by causing him to give testimony, more than two years after the event, without the same opportunity as the Defendants had to refresh his recollection with his prior statements.  Only barring use of the deposition thereby obtained will ameliorate this prejudice. Similarly, Judge Reyes acted well within his discretion in imposing costs and fees, as it is obvious that Plaintiff's counsel has had to spend a great deal of time preparing Plaintiff for his initial deposition and litigating the sanctions issue.  The cost of this dispute should fall on Defendants, not Plaintiff, who is blameless in it.  Indeed, even the sanctions Judge Reyes did impose are arguably insufficient, as they do not address the prejudice caused to Plaintiff by not having the details in Mr. Brown's contemporaneous statement as a basis for questioning Defendants at their depositions.  Any sanctions short of those imposed by Judge Reyes would therefore be grossly inadequate.

Defense counsel is wrong to minimize the prejudice to Plaintiff by arguing that the Recording contradicts the Hospital IAB Worksheet in "few and immaterial ways."  Dkt. 61 at 18. We have shown this is untrue.  *See* pp. 10-12, *supra*.  Meanwhile, on the same page where he claims that Plaintiff suffered no prejudice, defense counsel contends that the Recording reveals Plaintiff to have "fabricat[ed] facts to support his claims" and argues that "Plaintiff can and should be held accountable for" inconsistencies that resulted from his being deposed more than two years after the incident while being unable to refresh his recollection with the Recording.  *Id.* In other words, the defense argues it is entitled to profit from its misconduct in the most essential way: to exploit it to discredit Mr. Brown in a case where Mr. Brown, having been beaten while isolated in a secluded stairwell, is the sole witness for himself.

Defense counsel argues that Mr. Brown should not get a "second bite at the apple," which will allow him to "alter[] any prior testimony."  Dkt. 61 at 17.  However, that testimony resulted

26

from the sandbagging of which Plaintiff's counsel had been openly concerned all along.  It resulted from defense counsel's deliberate indifference to his discovery obligations, to his own promises, and to the court's concerns.  Rather than "alter[ing] the balance of the litigation," as defense counsel argues, *id.*, precluding Plaintiff's original deposition merely helps cure one aspect of the prejudice caused by defense counsel's misconduct.

The "sanction" Defendants propose of reopening Mr. Brown's deposition, *see id.* at 19-20, is no sanction at all, but rather would prejudice Mr. Brown further by forcing him to explain the discrepancies between his IAB Hospital Interview and his previous deposition testimony, creating still more unfair impeachment for Defendants to use at trial.  Judge Reyes's choice of remedy is the only one that makes sense: precluding the Defendants from further exploiting their own misconduct in sandbagging Plaintiff.

As for Judge Reyes's imposition of costs and fees, this was well within his discretion. *See Ritchie Risk-Linked Strategies*, 280 F.R.D. at 157 ("[I]t is generally appropriate, at a minimum, to require a party that has not complied with its discovery obligations to pay the reasonable fees and costs incurred by the moving party in seeking disclosure and/or in seeking discovery sanctions."); *Izzo v. ING Life Ins. & Annuity Co.*, 235 F.R.D. 177, 188 (E.D.N.Y. 2005) (Boyle, M.J.) ("The Second Circuit has characterized this sanction as 'the mildest' of the sanctions authorized by Rule 37." (quoting *Cine Forty–Second Street Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1066 (2d Cir.1979))).

Finally, most of the other factors listed above dictate strong sanctions.  As detailed at length throughout this memorandum, defense counsel acted willfully and in bad faith in failing either to disclose the recording or to give any adequate explanation for that failure; the period of noncompliance was long, spanning the entire 15-month discovery period, plus an extra month

27

afterward; defense counsel's behavior was part of a pattern of conscious disregard of his discovery obligations; Judge Reyes warned defense counsel on August 4 of possible sanctions; and the cost of Defendants' misconduct should be borne by Defendants, not Plaintiff.

## CONCLUSION

For the above reasons, this Court should affirm Judge Reyes's sanctions order, either on the grounds relied on by Judge Reyes (the Court's inherent authority to sanction for negligent non-compliance) or one of the alternative grounds advocated by Plaintiff previously and again now (inherent authority based upon a finding of bad faith, or Rule 37(c)(1)). Defendants should also be required to pay the costs and fees associated with this Rule 72 appeal.

Respectfully submitted,

LAW OFFICES OF JOEL B. RUDIN, P.C.
Joel B. Rudin
Haran Tae
152 West 57th Street, 8th Floor
New York, New York 10019
(212) 752-7600
jbrudin@rudinlaw.com
htae@rudinlaw.com

Amy Rameau, Esq.
16 Court Street, Suite 2504
Brooklyn, New York 11241
(718) 887-5536
rameaulawny@gmail.com

*Attorneys for Plaintiffs*

DATED:      New York, New York
            November 20, 2017